GARMAN TURNER GORDON LLP
ERIKA PIKE TURNER
Nevada Bar No. 6454
Email: eturner@gtg.legal
JARED M. SECHRIST
Nevada Bar No. 10439
Email: jsechrist@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000
Fax: (725) 777-3112

COAST LAW GROUP, LLP
David A. Peck (Cal. Bar No. 171854)
Ross M. Campbell (Cal. Bar No. 234827)
(Pro Hac Vice Applications to Be Submitted)
1140 S. Coast Highway 101
Encinitas, California 92024
Tel: (760) 942-8505
Email: dpeck@coastlaw.com
       ross@coastlawgroup.com

*Attorneys for Plaintiff, My Daily Choice, Inc.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MY DAILY CHOICE, INC., a Nevada corporation, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| WILLIAM T. BUTLER, an individual; KRISTEN BUTLER, an individual; and ARIEYL, LLC, a Florida limited liability company, | |
| Defendants. | |

Plaintiff MY DAILY CHOICE, INC. ("MDC" or "HempWorx") alleges as follows:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship between the respective parties. In addition, MDC asserts a claim arising under the Copyright Act (17 U.S.C. § 101, et seq.), giving rise to subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because MDC's principal place of business is located in this district, MDC primarily conducts business in this district, it entered into the agreements giving rise to its contract claims in this district, and a substantial part of the events giving rise to its claims occurred in this district. In addition, pursuant to MDC's Policies & Procedures to which the Butlers agreed, the parties consented to jurisdiction and venue in Clark County, Nevada.

**PARTIES**

3.      MDC is a corporation organized under the laws of the State of Nevada, with its principal office and place of business in Las Vegas, Nevada.

4.      On information and belief, Defendant WILLIAM T. BUTLER ("Travis Butler") is an individual residing in Saint Cloud, Florida.

5.      On information and belief, Defendant KRISTEN BUTLER ("Kristen Butler") is an individual residing in Saint Cloud, Florida.

6.      On information and belief, Defendant ARIEYL, LLC ("Arieyl") is a limited liability company organized under the laws of the State of Florida with a business address in Saint Cloud, Florida. Travis Butler, Kristen Butler, and Arieyl are collectively referred to herein as "Defendants."

**FACTS**

A.     **MDC's Business.**

7.      MDC is a leader in the direct sales industry and offers a variety of health and wellness products. In May 2017, MDC launched HempWorx, which includes a line of high-quality hemp-derived products.

8.	As a direct sales company, MDC markets and sells its products through its network of independent "affiliates." This system allows affiliates to build and manage a sales team by recruiting, motivating, and training others to sell MDC's products. Affiliates are compensated based on their sales of MDC products to affiliates and customers they refer to the company. Affiliates that are enrolled below a particular affiliate are known as that affiliate's "downline" or "downline organization."

9.	MDC has expended significant time, effort, and resources developing its affiliate network. MDC's network is essential to its business and constitutes its most valuable asset.

10.	To protect its affiliate network, MDC (like virtually every other direct sales company) contractually prohibits affiliates from engaging in certain cross-company recruiting ("cross-recruiting"). Cross-recruiting occurs when an affiliate of one company solicits another affiliate of the same company to enroll in a different or competing direct sales business, provided the person attempting to cross-recruit did not personally enroll the targeted affiliate in the first company. Cross-recruiting can be devastating to both a direct sales company and the businesses and organizations of its affiliates, and it is accordingly considered a highly unethical form of theft in the industry.

**B.	MDC's Policies & Procedures.**

11.	MDC prohibits cross-recruiting by requiring that all affiliates, as a condition of enrollment, agree to the terms set forth in the MDC Policies & Procedures.

12.	MDC's prohibition on cross-recruiting is set forth in section 17.2 of the Policies & Procedures, which provides:

> MDC Affiliates are free to participate in other [direct sales businesses]. However, during the term of this Agreement, any renewal or extension hereof, and for a period of one year following the termination of an Affiliate's Independent Affiliate Agreement, with the exception of an Affiliate who is personally sponsored by the Affiliate…, an Affiliate (or former Affiliate) may not recruit any MDC Affiliate or Customer for another network marketing business. Affiliates and the Company recognize that because network marketing is conducted through networks of independent contractors dispersed across the entire United States and internationally, and business is commonly conducted via the internet and telephone, an effort to narrowly limit the geographic scope of this non-solicitation provision would render it wholly ineffective. Therefore, Affiliates and MDC agree that this non-solicitation provision shall apply nationwide throughout the United States and to all international markets in which Affiliates are located. This provision shall survive the termination or expiration of the Affiliate Agreement. For the purposes of this Section 17.2, the term "recruit" means the actual or attempted sponsorship,

solicitation, enrollment, encouragement, or effort to influence in any way (either directly, indirectly, or through a third party) another MDC Affiliate or Customer to: (1) enroll, join, or otherwise participate in another network marketing business; or (2) terminate or alter his or her business or contractual relationship with the MDC.

13. Section 17.3 of the Policies & Procedures provides that: "Affiliates must not sell, or attempt to sell, any competing non-MDC programs, products or services to MDC Customers or Affiliates. Any program, product or services in the same generic categories as MDC products is deemed to be competing…."

14. The Policies & Procedures also contain the following non-disparagement provision:

[36.5] Non-Disparagement. MDC wants to provide its independent Affiliates with the best products, compensation plan, and service in the industry. Accordingly, we value your constructive criticisms and comments. All such comments should be submitted in writing to the Compliance Department. Remember, to best serve you, we must hear from you! While MDC welcomes constructive input, negative comments and remarks made in the field by Affiliates about the Company, its products, or compensation plan serve no purpose other than to sour the enthusiasm of other MDC Affiliates. For this reason, and to set the proper example for their downline, Affiliates must not disparage, demean, or make negative remarks about MDC, other MDC Affiliates, MDC's products, the Marketing and Compensation plan, or MDC's directors, officers, or employees.

15. In addition, Section 9.19 of the Policies & Procedures provides:

Social Media. During the term of this Agreement and for a period of 12 calendar months thereafter, an Affiliate may not use any social media site on which they discuss or promote, or have discussed or promoted, the MDC business or MDC's products to directly or indirectly solicit MDC Affiliates for another direct selling or network marketing program (collectively, "direct selling"). In furtherance of this provision, an Affiliate shall not take any action that may reasonably be foreseen to result in drawing an inquiry from other Affiliates relating to the Affiliate's other direct selling business activities. Violation of this provision shall constitute a violation of the non-solicitation provision in Section 17 (Conflicts of Interest) below. If an Affiliate creates a business profile page on any social media site that promotes or relates to MDC, its products, or opportunity, the business profile page must relate exclusively to the Affiliate's MDC business and MDC products. If the Affiliate's MDC business is cancelled for any reason or if the Affiliate becomes inactive, the Affiliate must deactivate the business profile page.

### C.   MDC's Copyrighted Compensation Plan.

16. MDC developed an industry leading compensation plan with a unique affiliate rewards program. The most prevalent compensation plans in the network marketing industry include binary and unilevel compensation plans, each having positive and negative attributes. MDC sought to develop a plan that would be most attractive to the widest range of affiliates, including both seasoned marketers and individuals that are new to network marketing. MDC ultimately developed a hybrid binary-unilevel compensation plan that offers the best attributes of both types of plans.

17. The plan is highly competitive and offers greater payouts than almost all other direct sales companies, including up to 85% of business volume rather than the more traditional 40-60%.

18. MDC invested substantial time and resources in preparing its written compensation plan (the "MDC Compensation Plan"). Because the compensation plan is one of the most important factors evaluated by affiliates in deciding whether to join a network marketing company, MDC designed its plan to ensure that it describes its payouts and commission structure in an effective and understandable manner, while at the same time avoiding technical descriptions that would deter the reader. MDC selected, coordinated, and arranged the elements of the plan to accomplish these goals in an original work, which includes the use of charts, visual elements, descriptions, and definitions.

19. The MDC Compensation Plan includes eight types of payouts, including (i) retail customer commissions, (ii) jump start bonuses (iii) binary commissions, (iv) leadership check matching, (v) the global bonus pool, (vi) rank incentives and bonuses, (vii) the VIP auto club, and (viii) elite expense accounts.

20. In 2014, Josh Zwagil, MDC's founder and CEO, created the MDC Compensation Plan as part of and within the scope of his services for MDC. The plan is set forth in a typewritten document. Because the plan is a work made for hire within the scope of Zwagil's services with MDC, MDC owns any and all copyright rights in the MDC Compensation Plan.

21. MDC is the exclusive owner of all right, title, and interest, including all rights under copyright, in the MDC Compensation Plan.

22. MDC is the owner of valid and subsisting United States Copyright Registration No. TX 8-890-740 for the MDC Compensation Plan, issued by the by the United States Copyright Office.

23. Since the creation of the MDC Compensation Plan, MDC has distributed, advertised, and publicly displayed copies of the plan in the United States, including by making it available on MDC's website and for MDC trainings.

24. The MDC Compensation Plan is of tremendous value to MDC because it was developed based on extensive experience and expertise in the network marketing industry, it was developed with the investment of significant time and resources, the plan has been widely successful in attracting affiliates, it is one of the reasons MDC has experienced substantial growth, and it has resulted in significant notoriety and the recognition of MDC as an industry leader and innovator.

**D.     Defendants' Business and Unlawful Conduct.**

25. In 2018, the Butlers became affiliates with MDC by affirmatively agreeing to the terms set forth in MDC's Policies & Procedures and the MDC Independent Affiliate Application and Agreement (collectively the "Contract"). The Butlers subsequently became two of MDC's highest-ranking affiliates and were considered leaders in the company.

26. The Butlers regularly promoted MDC and HempWorx products using social media pages, including Mr. Butler's "Rockstar Adventurer" Facebook page, Ms. Butler's personal Facebook page, and their "#RockstarAdventure" Facebook page (collectively, the "Social Media Pages"). Because of their rankings and leadership role in MDC's affiliate network, a substantial number of MDC affiliates began following the Butlers on social media, including affiliates the Butlers did not personally enroll at MDC.

27. The Butlers received significant compensation as MDC affiliates. Nevertheless, in early or mid-2020 (during a renewal term of the Contract), the Butlers commenced an unlawful and highly damaging campaign to raid MDC's business and affiliate network. They did so for their own financial benefit in launching Arieyl, a competing direct sales company that markets and sells competing health and wellness products. On information and belief, the Butlers own and operate Arieyl, and formed the company in February 2020.

28. On information and belief, in or about mid-2020, while they were still MDC affiliates, the Butlers began soliciting other MDC affiliates to join Arieyl and its competing network marketing program. In addition, the Butlers began soliciting MDC affiliates to join their 25-member Arieyl

"launch team." As part of these efforts, MDC is informed and believes that the Butlers began disparaging MDC and its personnel, which included false and defamatory claims.

29. On information and belief, the Butlers induced MDC affiliates that joined Arieyl, including members of the Arieyl launch team, to likewise breach their obligations under the MDC Policies & Procedures, including the prohibitions relating to cross-recruiting and the improper use of social media pages. For instance, a number of Arieyl's launch team members are using the same social media pages that they used to promote MDC to now solicit MDC affiliates for Arieyl. Members of the Arieyl launch team are attempting to duplicate the Butlers' unlawful conduct by cross-recruiting at least 25 members of their own respective launch teams.

30. To conceal their violations of the MDC Policies & Procedures, the Butlers induced MDC affiliates to sign non-disclosure agreements relating to Defendants' competing venture.

31. In or about September 2020, the Butlers began using the Social Media Pages to suggest they would soon be making a major announcement. For instance, on September 19, 2020, Mr. Butler posted, "If you only knew what was coming!!!" On information and belief, this post was intended to cause and did cause MDC affiliates to inquire with the Butlers about their future plans. Mr. Butler posted this statement on the Butlers' "Rockstar Adventurer" Facebook page

32. MDC began investigating the Butlers' potential violations of the MDC Policies & Procedures and suspended their affiliate accounts pending its review. In doing so, MDC asked the Butlers to sign a statement confirming they were not selling, or attempting to sell, any competing non-MDC programs, products or services to MDC's customers and affiliates. MDC further asked the Butlers to confirm they have not made various defamatory statements about MDC, it products, and its founder. The Butlers refused to sign the statement.

33. On October 26, 2020, the Butlers terminated their relationship with MDC.

34. The Butlers continued using the Social Media Pages to broadcast their forthcoming announcement to as many MDC affiliates as possible, including a large audience of affiliates they did not personally enroll at MDC. For instance, on November 1, 2020, Ms. Butler posted, "So in seven days, we'll spill the tea on what's next for the Butlers. Trust me it will be worth the wait…" Similarly, on November 5, 2020, Mr. Butler posted, "In THREE days we will tell you where we will be spending

our time next!" The Butlers regularly referred to this practice of attempting to generate interest in their announcements and activities as "spilling tea."

35. On November 8, 2020, the Butlers used the Social Media Pages to announce the launch of their new competing business, including a "soft launch" on November 17, 2020. Prior to doing so, Mr. Butler disingenuously posted, "Before I make my announcement tonight, I want to kindly and officially ask you, if you're currently with My Daily Choice/HempWorx and that's how we met, please 'unfollow' me on social media." Rather than complying with their ethical and legal obligations, this reflects the Butlers' continued effort to draw attention to Arieyl and cross-recruit MDC's affiliates in violation of the Policies & Procedures. Since that time, the Butlers have used the Social Media Pages to repeatedly promote Arieyl, its competing program, and its products.

36. On information and belief, Defendants used and copied the MDC Compensation Plan in preparing, publishing, displaying, and disseminating a document entitled the "Arieyl Compensation Plan" (the "Infringing Work").

37. Defendants had access to the MDC Compensation Plan via the MDC website and the Butlers' prior status as MDC affiliates.

38. On information and belief, the Butlers obtained physical possession of or otherwise viewed the MDC Compensation Plan, and intentionally copied and made a derivative work of the MDC Compensation Plan to create the Infringing Work. That the Butlers copied the MDC Compensation Plan when they created the Infringing Work is evidenced by the striking similarities between MDC's plan and the Infringing Work, which cannot be explained other than as a result of copying, and the numerous and substantial similarities between the works.

39. Examples of Defendants' copying are reflected in in Excerpts "A" and "B" below, which include excerpts from the MDC Compensation Plan and the Infringing Work, respectively.

40. The Butlers copied the MDC Compensation Plan without MDC's consent authorization, or knowledge, and without any remuneration to MDC.

41. The Infringing Work is substantially similar to the MDC Compensation Plan and, in some instances, virtually identical. For instance, the Infringing Work lists the same types and ordering of payouts, with almost identical layouts, charts, text, structure, and visual elements, as well as similar

use and ordering of definitions.

42. The similarities between the two works reflect that Defendants copied the MDC Compensation Plan, they did not independently develop the Infringing Work, and the similarities can only be explained by copying.

43. On information and belief, Defendants copied the MDC Compensation Plan by late October 2020, in anticipation of Arieyl's soft launch on or about November 17, 2020.

44. On information and belief, the Butlers then widely used, published, displayed, and disseminated the Infringing Work to promote its business and recruit affiliates that it would not have otherwise recruited. For instance, on or about November 23, 2020, the Butlers conducted a training meeting on Facebook to promote Arieyl using the Infringing Work.

45. On information and belief, the Butlers have generated, and/or plan to generate, substantial revenues and profits as a result of copying the MDC Compensation Plan and using, publishing, and displaying the Infringing Work. The Butlers have also caused substantial harm to MDC in causing MDC affiliates to leave MDC and join Arieyl as a result of their infringing conduct.

46. The Butlers' contractually-prohibited and otherwise unlawful conduct has included, among other things, (i) cross-recruiting MDC affiliates (including affiliates they did not personally sponsor) to enroll with Arieyl; (ii) promoting Arieyl and its products on the same social media channels they used to promote MDC; (iii) making disparaging and false comments about MDC, its owners, and its products, both to facilitate the cross-recruitment of MDC affiliates and to give Arieyl an unlawful advantage over MDC in the marketplace; (iv) targeting key MDC leaders to induce other affiliates to join Arieyl; (v) conducting live and private meetings in furtherance of their efforts to cross-recruit for Arieyl; (vi) inducing MDC affiliates to breach the confidentiality and cross-recruiting provisions of the Policies & Procedures; (vii) coordinating efforts to transfer MDC downlines to Arieyl; (viii) entering into "Confidentiality Agreements" with MDC's affiliates in an effort to conceal their unlawful conduct; and (ix) copying the MDC Compensation Plan.

///

///

///

-9-

COMPLAINT

## FIRST CAUSE OF ACTION
For Breach of Contract
(against Travis Butler and Kristen Butler)

47. MDC re-alleges paragraphs 1 through 46 as if fully set forth herein.

48. The MDC Policies & Procedures set forth terms of a valid and enforceable Contract between MDC and its affiliates, including Travis Butler and Kristen Butler.

49. As a condition of becoming MDC affiliates, the Butlers expressly agreed that, pursuant to the MDC Policies & Procedures, they would refrain from (i) cross-recruiting affiliates they did not personally sponsor, both during the term of the Contract and for one year thereafter; (ii) disparaging MDC, and (iii) misusing social media.

50. Notwithstanding their Contract with MDC, and despite having profited significantly thereunder, the Butlers have breached and remain in breach of, and continue to fail and refuse to abide by, the cross-recruiting, social media, and non-disparagement provisions of the Contract.

51. Any and all conditions of the Butlers' obligations under the Contract have been performed. MDC has performed all of its material obligations.

52. As a direct, legal, and proximate result of Defendants' breaches, MDC has suffered recoverable damages in an amount to be proven at the time of trial. MDC is further entitled to immediate injunctive relief. MDC is further entitled to fees and costs incurred to enforce the Contract.

## SECOND CAUSE OF ACTION
For Tortious Interference with Contract
(against all Defendants)

53. MDC re-alleges paragraphs 1 through 52 as if fully set forth herein.

54. Each affiliate that has marketed MDC's products has done so pursuant to enforceable written agreements with MDC that incorporated the MDC Policies & Procedures, including its provisions regarding cross-recruiting and misuse of social media.

55. Through the conduct alleged above, Defendants intentionally sought to induce other MDC affiliates (i) to cease promoting MDC's products and to instead market and sell competing products offered by Arieyl, and (ii) to breach their own obligations under the Policies & Procedures related to cross-recruiting and the misuse of social media. In doing so, Defendants engaged in

intentional acts designed to induce a breach or disruption of MDC's contractual relationships with its affiliates, and knew the interference was certain or substantially certain to occur as a result.

56. Defendants' conduct has caused the actual breach and disruption of MDC's contractual relationships.

57. MDC has suffered direct and consequential harm as a result of Defendants' intentional interference with MDC's contractual relations and is entitled to damages therefor in an amount to be proven at the time of trial.

58. MDC has suffered and continues to suffer irreparable injury as a result of Defendants' misconduct and is entitled injunctive relief.

59. Defendants' conduct was fraudulent, oppressive, willful, malicious, and undertaken with a conscious disregard for MDC's rights, warranting an award of exemplary and punitive damages.

### THIRD CAUSE OF ACTION
For Copyright Infringement (17 U.S.C. § 501)
(against all Defendants)

60. MDC re-alleges paragraphs 1 through 59 as if fully set forth herein.

61. The MDC Compensation is an original work containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq. MDC is the exclusive owner of rights under copyright in and to the MDC Compensation Plan. MDC owns a valid copyright registration for the MDC Compensation Plan, as further alleged above.

62. Through Defendants' conduct alleged herein, including its reproduction, distribution, and public display of the Infringing Work, which is copied from, derivative of, and substantially similar to the MDC Compensation Plan, without MDC's permission, Defendants have directly infringed MDC's exclusive rights in the MDC Compensation Plan in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

63. On information and belief, the infringing conduct of Defendants alleged herein was and continues to be willful and with full knowledge of MDC's rights in the MDC Compensation Plan, and has enabled Defendants to unlawfully obtain profit therefrom.

64. On information and belief, the Butlers are also contributorily and vicariously liable for

Defendants' infringing conduct, as they were aware of, orchestrated, and participated in the copying of MDC's Compensation Plan in preparing the Infringing Work.

65. As a direct and proximate result of Defendants' infringing conduct alleged herein, MDC has been harmed and is entitled to damages in an amount to be proven at trial. MDC is also entitled to recovery of Defendants' profits attributable to its infringing conduct, and an accounting of and a constructive trust with respect to such profits.

66. As a direct and proximate result of Defendants' infringing conduct, MDC has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless their infringing conduct is enjoined, they will continue to infringe the MDC Compensation Plan. MDC is therefore entitled to preliminary and permanent injunctive relief enjoining their ongoing infringing conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, MDC requests that the Court enter judgment as follows:

1. For injunctive relief enjoining Defendants' ongoing breaches and tortious conduct;

2. For specific performance of express obligations under the Contract and for the recovery of commissions paid to the Butlers during the course of their unlawful conduct;

3. For actual damages in an amount to be proven at the time of trial;

4. That the Court enter judgment finding that Defendants have engaged in copyright infringement in violation of 17 U.S.C. § 501;

5. That the Court preliminary and permanently enjoin Defendants and their officers, agents, representatives, employees, successors, assigns and any persons in active concert or participation with any of them from:

    a. further distributing, marketing, advertising, promoting, displaying, or authorizing any third party to distribute, market, advertise, promote, or display, the Infringing Work and any products, works, or other materials that include, copy, are derived from, or otherwise embody the MDC Compensation Plan;

    b. reproducing, distributing, or publicly displaying the MDC Compensation Plan, creating any derivative works based on the MDC Compensation Plan, or engaging

in any activity that infringes MDC's rights in the MDC Compensation Plan; and

c. aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) or (b).

6. That the Court order Defendants to account to MDC for, and disgorge to MDC, all profits and gains derived as a result of the unlawful acts complained of above, including profits obtained as a result of their copyright infringement, including but not limited to all profits from exploitation of the Infringing Work and any products, works, or other materials that include, copy, are derived from, or otherwise embody the Infringing Work or the MDC Compensation Plan, or in the Court's discretion, such amount as the Court finds to be just and proper;

7. That the Court award MDC the damages it sustained as a result of Defendants' copyright infringement and/or statutory damages under the Copyright Act;

8. For costs of suit;

9. For pre-judgment and post-judgment interest on the foregoing sums;

10. For such other and further relief as the Court deems just and proper; and

11. That the Defendants be jointly and severally liable for any damages award.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury in this action on all issues so triable.

Dated:  November 30, 2020                Respectfully submitted,

GARMAN TURNER GORDON LLP


By: */s/ Erika Pike Turner*
ERIKA PIKE TURNER
Nevada Bar No. 6454
Email: eturner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000
Fax: (725) 777-3112

*Attorneys for Plaintiff My Daily Choice, Inc.*

Excerpt "A" from the MDC Compensation Plan:



Excerpt "A" from the Infringing Work:

Excerpt "B" from the MDC Compensation Plan:



Excerpt "B" from the Infringing Work:

